## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| LOIS A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-1150 |
| | ) | |
| NANCY A. BERRYHILL, Acting | ) | Honorable Joe B. McDade |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION & ORDER</u>

This social security appeal is before the Court on the Motion for Summary Judgment (Doc. 11) filed by the Plaintiff, Lois A., and the Motion for Summary Affirmance (Doc. 13) filed by the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security. The motions have been fully briefed and are ready for ruling. For the reasons stated below, Plaintiff's motion is GRANTED, and Defendant's motion is DENIED.  The final decision of the Commissioner is REVERSED and REMANDED for further consideration consistent with this Opinion and Order.

## BACKGROUND

### I.    Procedural History

On January 31, 2014, Plaintiff filed for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act claiming that she had been disabled as of January 1, 2012.  (R. 108,

117).[1] She later amended the disability onset date to March 28, 2013. (R. 30, 181). Her date last insured was September 30, 2015. (R. 225). She initially alleged that she is disabled due to arthritis (R. 86) but the Commissioner accepts that she also suffers from chronic heart failure, sleep apnea and morbid obesity. Her initial claim was denied on June 18, 2014. (R. 104, 105). The claim was again denied upon reconsideration on December 8, 2014. (R. 106, 107). Plaintiff requested a hearing that was held before an Administrative Law Judge ("ALJ") on December 7, 2015. (R. 145, 25-85). Plaintiff was represented by a non-attorney disability representative, Dannelly C. Smith, and a Vocational Expert ("VE") testified. (R. 63-84). The ALJ denied Plaintiff's claim on February 19, 2016. (R. 28). The Appeals Council refused to reconsider Plaintiff's claim on February 6, 2017 (R. 1-5), thereby making the ALJ's decision the final decision of the Commissioner of Social Security. Plaintiff then timely appealed to this Court pursuant to 42 U.S.C. § 405(g) by filing a civil complaint on April 11, 2017.

## II.    Factual and Medical Background

Plaintiff was born on August 13, 1955. She was sixty years old at the time of the hearing before the ALJ as well as her date last insured. The record notes she earned income for her last job at a children's home in 2010. (R. 199). However, she states she left the job in 2009 because her health disallowed her to keep up with the pace of the work. (R. 55). The record is not clear which is correct but since the onset

---

[1] Citation to (R. ___ ) refers to the page in the certified transcript of the entire record of proceedings provided by the Social Security Administration.

date of disability is alleged to be March 28, 2013, the Court finds the discrepancy does not matter.

Plaintiff stressed at the hearing before the ALJ that her heart condition is the main problem causing her not to be able to function. (R. 54). She also mentioned she suffers from arthritis but neither the ALJ nor her representative seem to have given it much significance. The ALJ failed to mention arthritis in his decision and the representative similarly did not mention it in a letter he wrote the ALJ in which he outlined Plaintiff's ailments. (*See* R. 13-20, 181-82). Moreover, Plaintiff now only refers to arthritis a single time in her brief, where she takes issue with the ALJ's treatment of her symptoms. (Doc. 12 at 13). In any event, the ALJ concluded Plaintiff was suffering from the following severe impairments that significantly limited her ability to perform basic work functions: congestive heart failure, obesity, and obstructive sleep apnea. (R. 15).

Although the alleged onset date of disability is March 28, 2013, the Court finds it is worth mentioning a previous incident to give a more complete picture of the Plaintiff's medical history. In May 2011, Plaintiff visited an emergency room ("ER") because she was exposed to peanuts, to which she is allergic. (R. 370). Plaintiff exhibited high blood pressure with a systolic blood pressure in the 170s[2], a heart rate

---

[2] Systolic blood pressure "measures the pressure in your blood vessels when your heart beats." Systolic blood pressure greater than 140 mmHg is high. *See* "What Blood Pressure Numbers Mean", available at https://www.cdc.gov/bloodpressure/measure.htm.

ranging between 150s-180s[3] beats per minute ("bpm"), and an irregular heart rhythm. (R. 361). The Plaintiff's electrocardiogram ("EKG")[4] showed supraventricular tachycardia[5] ("SVT") with occasional premature complexes[6]; possible inferior infarct[7], age undetermined. (R. 361, 366). Medical providers also noted that the Plaintiff had 1+ bilateral edema[8] to the lower extremities. (R. 360).

On March 28, 2013, Plaintiff went to the hospital for pink eye. (R. 332). However, providers found that she was in rapid atrial fibrillation ("A. Fib.") with rapid ventricular response, which means her heart was beating abnormally fast. *See* https://www.webmd.com/heart-disease/atrial-fibrillation/afib-rapid-response#1. Plaintiff also had uncontrolled hypertension. During the hospitalization, a chest x-ray was performed showing cardiomegaly (an abnormal enlargement of the heart)

---

[3] Average heart rate for an adult is 60-100 beats/ minute. Donna D. Ignatavicius & M. Linda Workman,  Medical-Surgical Nursing: Critical Thinking for Collaborative Care 680 (Lee Henderson ed., 5th ed. 2006).

[4] Electrocardiograms are graphic tracings of the variations in electrical potential caused by the excitation of the heart muscle and detected at the body surface. *See Dorlands Illustrated Medical Dictionary,* 1780 (32nd ed. 2012).

[5] Supraventricular Tachycardia "involves the rapid stimulation of atrial tissue at a rate of 100 to 280 beats/min, with mean (average) of 170 beats/min."  Symptoms of SVT include palpitations, shortness of breath, nervousness, anxiety, hypotension (low blood pressure) and weakness. Ignatavicius & Workman, *supra*, at 720-21.

[6] Premature Complexes are heart beats that arrive early because atrial tissue becomes irritable, which creates an extra heartbeat. Ignatavicius & Workman, *supra*, at 721.

[7] Commonly called a Myocardial Infarction (MI) or heart attack. "Silent myocadial ischemia and silent myocardial infarction (MI) once believed relatively rare, are now recognized to affect 21% to 68% of older adults with coronary artery disease (CAD)". Ignatavicius & Workman, *supra*, 846.

[8] Edema is swelling caused by excess fluid trapped in your body's tissues and is a sign one may have congestive heart failure. https://www.mayoclinic.org/diseases-conditions/edema/symptoms-causes/syc-20366493.

and mild venous congestion. (R. 335). A transthoracic echocardiogram[9] ("TTE") was performed, which showed mild systolic dysfunction,[10] mild concentric hypokinesis and ventricular hypertrophy,[11] moderate diastolic dysfunction, and borderline enlargement of the right ventricle. (R. 781). Plaintiff was given appropriate medication and discharged after her heartbeat and blood pressure were normalized. (R. 333). She was told to follow up with her primary physician and resume activities as tolerated. (R. 337).

In April 2013, Plaintiff followed up with her primary physician, who recorded that she was still undergoing A. Fib. with a heart rate higher than the normal range. (R. 329). A month later, Plaintiff went to the hospital on the recommendation of her primary care physician for her irregular heartbeat. (R. 320). There, she saw a cardiologist, Dr. Venkatapuram. He noted that Plaintiff still appeared in A. Fib., had elevated blood pressure (162/102), and that she had gained 50 lbs. over the past 12 months. (R 324, 327). He started her on Coreg, a drug used to treat high blood pressure and congestive heart failure. He also advised her to engage in regular physical activity. (R. 324).

In January 2014, Plaintiff visited a few medical care providers. On January 23, 2014, Dr. Venkatapuram wrote the following after having examined Plaintiff:

---

[9] Transthoracic Echocardiogram is a non-invasive diagnostic test which uses an ultrasound to take cardiac measurements. Ignatavicius & Workman, *supra*, at 701-02.

[10] Decreased pumping ability of the heart and impaired profusion to the body. (Med Surg Nursing page 753).

[11] Thickening of the heart wall. Ignatavicius & Workman, *supra*, at 752.

5

Lois [A.] is a 58-year-old woman with past medical history significant for Hypertension, chronic diastolic heart failure, atrial fibrillation, possible tachycardia induced cardiomyopathy with mild LV systolic dysfunction with LVEF of 40-45%, GERO, Obesity, status post gastric bypass, degenerative joint disease, presented for follow-up. She was last seen in the office on 5/10/13. At that time she was recommended to start with therapeutic anticoagulation and was also started on coreg 3.125 mg BID for better BP control. She was initially started on coumadin. Pt *had very* difficult time maintaining the therapeutic INR. Subsequently she was started on Xarelto 20 mg.

Upon return evaluation, she has been doing well from cardiac stand point. Feels much better. Overall shortness of breath, exertional dyspnea, and fatigue has *improved.* <u>Able to do the regular household chores without significant limitation.</u> The patient complains of intermittent racing of the heart lasting for 15 minutes and spontaneously relieved. The patient <u>complains of intermittent lightheadedness with sudden change of posture, especially in the AM.</u> <u>Denies any syncope or presyncope.</u>[12] *Clo* pedal edema after sitting for too long or being on her feet for too long. Denies any orthopnea or paroxysmal nocturnal dyspnea. denies any chest pain. The patient complains of sleep problems - difficulty staying asleep due to restless legs. Also c/o snoring. Not sure about apnea. The patient complains of daytime somnolence, fatigue. Never had any sleep study in the past. The patient complains of weight gain, - 52 lbs since 8/13. Wondering about diet and weight loss. Tolerating the current regimen including Xarelto well. She is an ex-smoker, used to smoke 1.5 pack per day for 20 years, quit in 2002. Drinks alcohol occasionally. She does not do any regular exercise and other than taking care of her grandchildren.

(R. 388 (emphasis added)).

Another TTE was performed on January 27, 2014 showing new findings such as mild enlargement of both the right and left atrium, mild tricuspid regurgitation[13],

---

[12] Syncope is temporary loss of consciousness due to a fall in blood pressure. Presyncope is a state of lightheadedness, muscular weakness, blurred vision, and feeling faint.

[13] "Regurgitation prevents the . . . valve from closing completely during systole . . . . [and] allows the back flow of blood into the atrium when the . . .ventricle contracts." Ignatavicius & Workman, *supra*, at 764.

mild pulmonary hypertension[14], dilated inferior vena cava, and elevated right atrial pressure. (R. 316-317). The next day, Plaintiff underwent a sleep evaluation. The physician, Dr. Iklandos, noted that Plaintiff reported sleep problems such as excessive daytime sleepiness, snoring and waking up from feeling like her legs were kicking but also noted "no manifestations of restless leg syndrome, cataplexy, sleep paralysis, or hypnagogic hallucinations;" that Plaintiff reported never falling asleep while driving and never having accidents because she fell asleep while driving." (R. 351). Nevertheless, Dr. Iklandos gave Plaintiff driving precautions (he did not elaborate on what those precautions were). He also noted Plaintiff did not report any chest pain, abdominal pain or leg pain. (R. 351).

In April 2014, Plaintiff had another appointment with Dr. Iklandos. (R. 377). This time he listened to her lungs and noted hearing bilateral rhonchi (R. 380), which are continuous low pitched, rattling lung sounds that often resemble snoring. They are frequently heard in patients with chronic obstructive pulmonary disease (COPD), bronchiectasis, pneumonia, chronic bronchitis, or cystic fibrosis. Dr. Iklandos also observed +1 bilateral pedal edema. A chest x-ray was performed, which revealed an enlarged cardiac silhouette, and mild pulmonary congestion[15]. (R.381). A sleep study performed in February showed mild obstructive sleep apnea hypopnea (abnormally

---

[14] Pulmonary hypertension occurs during right sided heart failure (also called Cor Pulmonale) due to increased blood vessel constriction causing decreased blood flow. Ignatavicius & Workman, *supra*, at 609.

[15] Pulmonary edema is a caused by excess fluid buildup in the lungs. The air sacs in the lungs fill with fluid which make it difficult for a person to breathe. https://www.mayoclinic.org/diseases-conditions/pulmonary-edema/symptoms-causes/syc-20377009

slow or shallow breathing), which was worse with rapid eye movement ("REM"), supine[16] sleep, and periodic limb movement during sleep ("PLMS"). Plaintiff was noted to still be suffering A. Fib. with premature ventricular contractions.

On May 23, 2014, Plaintiff underwent a consultative examination for the Bureau of Disability Determination Services with Dr. Charles Carlton. (R. 431). Dr. Carlton reviewed Plaintiff's records including her allegations of arthritis. Dr. Carlton noted that Plaintiff said she was advised not to drive because of excessive sleepiness. (R. 432). She reported her last day of work was in 2012. Dr. Carlton further noted Plaintiff's lungs were clear—no wheezing or rhonchi, and her heart rate and rhythm were normal. (R. 433). She displayed full painless range of motion in all joints except her hips and knees. He attributed her limitations to the effects of morbid obesity and her large body. (R. 434). He noted limited movement in her lower back with tenderness and discomfort. His impressions were that Plaintiff suffers from morbid obesity with a body mass index over 54%, chronic back pain being treated with medication, congestive heart failure, obstructive sleep apnea requiring a CPAP machine, GERD, subjective statements of fatigue and shortness of breath and limited tolerance for standing, walking, and bending. He concluded Plaintiff could safely sit and stand; could walk greater than fifty feet without an assistive device; could handle objects using both hands; lift 10-20 pounds; and hear and speak. (R. 435). Dr. Carlton did not note any severe or unable to perform findings for Plaintiff in the categories of

---

[16] Supine is to lay flat on your back face up.

walking, squatting and rising, needing an assistive device. (R. 436). His other conclusions did not show any abnormality. (R.437-439).

In December 2014, Plaintiff called 9-1-1 in distress. (R. 655). She told the emergency personnel who arrived that she had serious diarrhea and shortness of breath upon walking back and forth to the washroom. They noted she was in A.Fib., with a heartrate of about 150 to 190 bpm. (R. 655). They took her to an ER where Plaintiff complained of shortness of breath. (R. 474). The ER personnel noted Plaintiff had shortness of breath, leg swelling, and an irregular heartbeat. She stayed in the hospital for two days. At its highest point, Plaintiff's heartrate was in the 220 bpms. (R. 483). An EKG was performed which confirmed A. Fib. (R. 503). A chest x-ray was performed which showed indicia of stage 2 chronic heart failure and signs of early developing pulmonary edema. (R. 536). During the hospitalization, Plaintiff also had increased pitting edema to lower extremities and bilateral crackles[17] noted to lungs. Another TTE was performed, which showed worsening cardiac functioning. (R. 533). Plaintiff's condition was eventually controlled, and she was discharged on December 13, 2014, with directions to follow up with her cardiologist and her primary care physician. (R. 487).

On December 26, 2014, Plaintiff followed up with her primary care physician and reported to him that she was not experiencing shortness of breath, chest pains

[17] Crackles that do not diminish with coughing are an indicator of heart failure, which occur when the lower areas of the lungs, or bases, fill with intra-alveolar fluid, as the disease progresses the fluid can then spread upward. Ignatavicius & Workman, *supra*, at 754.

or palpitations and her leg swelling had improved, yet her nocturnal dyspnea was still occurring occasionally necessitating her to sleep with head elevated. (R. 905). In August 2015, Plaintiff again visited her primary care physician and this time reported shortness of breath when lying flat and when exerting herself, as well as palpitations but no chest pain. (R. 897).

On September 17, 2015, Plaintiff again saw her primary care physician who noted that she continued to experience shortness of breath and weight gain; her weight was 346 pounds with a BMI of approximately 57. (R. 890, 898). In November 2015, Plaintiff saw a new cardiologist, Dr. Kizhakekuttu (R. 932). She continued to report chronic shortness of breath but denied any new cardiac complaints, denied experiencing chest pain, palpitations, lightheadedness, dizziness, syncope, presyncopal symptoms, or sleep issues. (R. 932). An EKG did reveal septal infarct, which is where a patch of dead, dying, or decaying tissue is on the wall that separates the right ventricle of your heart from the left ventricle.[18]

On December 7, 2015, the ALJ held a hearing where the Plaintiff and a Vocational Expert testified. Plaintiff was represented by a non-attorney representative. Plaintiff has a GED, which is a substitute for a high school diploma and some community college coursework in nursing. For the majority of her working history, Plaintiff was a cook. In that role she prepared meals for large numbers of children and carried heavy supplies and washed dishes. She also provided recreational aide support by setting up trampolines and other equipment for kids to

---

[18] *See* https://www.healthline.com/health/septal-infarct.

play outdoors. She claims she had to routinely lift up to forty pounds in her job as a cook.

As far as her symptoms, Plaintiff told the ALJ her arthritis was really bad in her legs but mainly her A. Fib. was causing her shortness of breath sufficient to limit her ability to walk and lift objects. (R. 54-55). Plaintiff said she cannot be on her feet for more than 10 to 15 minutes. (R. 55). She literally said she cannot pick up anything or do anything. (R. 55). As for household chores, she washes dishes while sitting but denies doing anything other than shopping. (R. 59-60). She uses an electric cart to move around the grocery store (R. 62). She drinks occasionally.[19] (R.58-59). She uses a CPAP machine but denies it helps; she claims she only sleeps a few hours a night. (R. 61).

The VE also testified. She identified Plaintiff's past work as including the position of cook with a specific vocational preparation ("SVP") rating of 6 and a description as medium (R. 64) and several other iterations of cook. She also identified the position of shelter monitor with an SVP of 3 and description as light. Another position the VE identified was recreational aide but this Court did not find the VE mentioning the SVP and description for this job. The ALJ posed the following hypothetical to the VE:

> Q. .... Let's go through our first hypothetical piece. And that'll be number one. Assume a hypothetical individual with the same age, education, and work history as the claimant and the functional capacity to perform the full range of light work as described in the DOT. In addition, the individual is able to never climb ladders, ropes, and scaffolds.

---

[19] Plaintiff's responses to the ALJ's straightforward questions seemed unnecessarily vague and evasive.

Occasionally climb ramps, stairs, stoop, kneel, crouch, and crawl. Avoid concentrated exposure to extreme heat defined as greater than 80 degrees Fahrenheit. Also, avoid extreme cold defined as less than 32 degrees Fahrenheit. Also, avoid concentrated exposure to hazardous machinery and unprotected heights. And so, my question to you is going to be is this individual going to be is this individual going to be able to do the claimant's past work?

A. .... The recreation aide remains viable or feasible.

(R. 67-68).

## LEGAL STANDARDS

### I.    Disability Standard

To qualify for disability insurance benefits and/or SSI under the Social Security Act, claimants must prove that they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). Additionally, the impairment must be of a sort "which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). With respect to a claim for a period of disability and disability insurance benefits, claimants must also show that their earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits and that their disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1)(B).

The Commissioner engages in a factual determination to assess claimants' abilities to engage in substantial gainful activity. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). To do this, the Commissioner uses a five-step sequential analysis to determine whether claimants are entitled to benefits by virtue of being disabled.

20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made as to whether the claimant is presently involved in any substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in such activity, the Commissioner then considers the medical severity of the claimant's impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments meet the twelve-month duration requirement, the Commissioner next compares the claimant's impairments to a list of impairments contained in Appendix 1 of Subpart P of Part 404 of the Code of Federal Regulations and deems the claimant disabled if the impairment matches the list. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not match the list, then the Commissioner considers the claimant's Residual Functional Capacity ("RFC")[20] and past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If claimants are still able to perform their past relevant work, then they are not disabled and the inquiry ends. *Id.* If they are unable to perform their past relevant work, then the Commissioner considers the claimants' RFC, age, education, and work experience to see if they can transition to other work. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If a transition is not possible, then the claimant is deemed disabled. *Id.*

---

[20] Residual Functional Capacity is defined as "the most [claimants] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The plaintiff has the burden of production and persuasion on the first four steps of the Commissioner's analysis. *McNeil*, 614 F.2d at 145. However, once the plaintiff shows an inability to perform any past relevant work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment. *Id.* (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 861 (7th Cir. 1978)).

## II.    Standard of Review

When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). The Court must ensure that the ALJ "build[s] an accurate and logical

bridge from the evidence to his conclusion," but he need not address every piece of evidence. *Clifford*, 227 F.3d at 872. Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## DISCUSSION

Plaintiff contends the ALJ committed a number of errors that require a reversal and remand. First, Plaintiff argues that the ALJ did not support his assessment of her RFC with substantial evidence. Second, she contends the ALJ erred in finding her capable of past work. Third, Plaintiff contends the ALJ made an improper credibility determination. (Doc. 13 at 17).

## I.     The ALJ's RFC Assessment.

Courts "deferentially review the ALJ's factual determinations and affirm the ALJ if the decision is supported by substantial evidence in the record." *Craft*, 539 F.3d at 673. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled." *Id.* "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s) [. . .] may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 SSR LEXIS 5, *5. "RFC represents the most that an individual can do despite his or her limitations or restrictions." *Id.* at *12.

The ALJ found that the Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except Plaintiff must never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, and occasionally stoop, kneel, crouch, and crawl. Further, Plaintiff must avoid concentrated exposure to extreme heat (defined as greater than 80 degrees Fahrenheit) and extreme cold (defined as less than 32 degrees Fahrenheit), and also avoid concentrated exposure to hazardous machinery and unprotected heights. Sections 404.1567(b) and 416.967(b) provide in relevant part that "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."

Plaintiff contends the ALJ erred in giving "great" weight to the opinions of Drs. Mitra and Carlton in making the RFC finding. She contends Dr. Mitra relied on an incomplete record in forming her opinion because that opinion was reached in December 2014, months before several instances relevant to Plaintiff's longitudinal health occurred. True enough, none of the events of 2015 recounted above were taken into consideration by Dr. Mitra. This critique also extends to Dr. Carlton's opinion, which was also made in 2014.

This Court believes that the doctors' unavoidable failures to consider the evidence in the record subsequent to the issuance of their respective opinions alone does not discount the ALJ's reliance on those opinions. Only if the ALJ ignored the underlying medical evidence from 2015 and such evidence required medical opinion testimony, would his decision be so infirm as to require remand. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) ("the administrative law judge failed to submit that MRI to medical scrutiny, as she should have done since it was new and potentially decisive medical evidence").

Here, the ALJ discussed evidence subsequent to the issuance of the doctors' respective opinions. (R. 18). He noted that the Plaintiff reported much improved leg swelling and had no complaints of shortness of breath, chest pain, or palpitations in November 2015. (R. 905). The most alarming omission the ALJ made was not discussing the fact that in November 2015, an EKG revealed septal infarct, which is where a patch of dead, dying or decaying tissue is on the wall that separates the right ventricle of your heart from the left ventricle. As this Court understands it, such evidence along with the existence of chronic shortness of breath, can evince severe heart damage dating back to 2013 when Plaintiff's first cardiologist diagnosed that Plaintiff suffered from congestive heart failure. (R. 324). However, as the ALJ noted, Plaintiff denied any new cardiac complaints, denied experiencing chest pain, palpitations, lightheadedness, dizziness, syncope, presyncopal symptoms, or sleep issues while maintaining that she still suffered from chronic shortness of breath. (R. 932).

It must be noted that there is no indication that the cardiologist who examined Plaintiff in 2015 thought her situation was so serious as to suggest limiting her activities because of a deteriorating heart condition. For that matter, this Court did not find in the record any physician ever limiting Plaintiff's activities beyond driving because of drowsiness due to sleep problems. Interestingly, in 2013, Plaintiff's first cardiologist advised her to engage in regular physical activity (R. 324) despite recognizing that Plaintiff suffered from A. Fib., had elevated blood pressure (162/102), had gained 50 lbs. over the past 12 months, and clearly suffered from congestive heart failure.

Plaintiff claims the ALJ should have found her limited to sedentary work instead of light work because light work requires one to walk or stand for six hours out of an eight-hour workday. *See DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989) ("Under the regulation defining light work, DeFrancesco's inability to operate foot controls does not make him incapable of doing light work, provided he can walk or stand for six hours out of an eight-hour workday."); *see* Social Security Ruling 83-10. Certainly a good deal of walking and standing seems out of the realm of possibility for Plaintiff if one fully credits her subjective statements. After all, she stated she can only stay on her feet 10 to 15 minutes before needing to sit down. (R. 55). Unfortunately, as earlier noted, there is no medical support for Plaintiff's subjective statement in the record before the ALJ.

The Court cannot conclude the ALJ should have taken Plaintiff's statements as unassailably correct. In her testimony to the ALJ, Plaintiff made statements at

times that were completely incredulous, almost encroaching upon hyperbole. She told the ALJ she could not lift anything, could do nothing; even while admitting elsewhere that she could do dishes while sitting and shop for groceries with the use of a scooter. (R. 55). Moreover, the record showed Plaintiff frequently misstated facts such as what prior jobs she actually held and for how long and had no explanation for her misstatements. (R. 42-43, 51). It also seemed that simple questions of little consequence yielded different answers, such as the ALJ's questioning of Plaintiff's alcohol use. In response to the ALJ's question of how much she drinks, Plaintiff responded "once every two or three, four month or something" to the ALJ. Yet as recently as August, 2015 her physician noted her alcohol use as three to four drinks once a week. (R. 894). And perhaps it is most telling that Plaintiff told her cardiologist in 2015—somewhat anomalously to her medical history—that she had no new cardiac complaints, denied experiencing chest pain, palpitations, lightheadedness, dizziness, synapse, presyncopal symptoms, or sleep issues. (R. 932). Obviously, this does not mean Plaintiff is not disabled, but surely this reflects on her propensity to make misstatements.

In *Filius v. Astrue*, the Seventh Circuit held that an ALJ did not err when he accepted the opinions from the two state-agency physicians who concluded that the plaintiff did not meet or medically equal any listed impairment because no other physician contradicted those opinions. 694 F.3d 863, 867 (7th Cir. 2012). This is the same situation here. Plaintiff has nothing other than her own statements to counter the opinions provided by Drs. Carlton and Mitra.

Dr. Carlton noted Plaintiff displayed full painless range of motion in all joints except her hips and knees. He attributed her limitations to the effects of morbid obesity and her large body. (R. 434). He also noted limited movement in her lower back with tenderness and discomfort. His impressions were Plaintiff suffers from morbid obesity with a body mass index over 54%, chronic back pain being treated with medication, congestive heart failure, obstructive sleep apnea requiring a CPAP machine, GERD, subjective statements of fatigue and shortness of breath and limited tolerance for standing, walking, and bending. However, Dr. Carlton also concluded Plaintiff could safely sit and stand; could walk greater than fifty feet without an assistive device; could handle objects using both hands; and lift 10-20 pounds. (R. 435). Moreover he did not note any severe or unable to perform findings for Plaintiff in the categories of walking, squatting and rising, needing an assistive device. (R. 436). His other conclusions also did not show any abnormality. (R. 437-439).

Dr. Mitra specifically opined that Plaintiff could stand or walk for a total of six hours in an eight hour work day. (R. 122). This is clearly not a case where one cannot follow the logical path from the evidence to the ALJ's conclusions.

The question comes down to this: whose responsibility was it to request any additional medical opinion regarding the 2015 occurrences. Respondent cites *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 697 (7th Cir. 2010), for the proposition that it was Plaintiff's responsibility to submit a medical opinion or, at minimum, represent to the ALJ that a medical expert was needed to evaluate this 2015 evidence to the extent she claims this evidence evinces disability. Plaintiff

counters that nothing in the regulations requires this Court to conclude that a claimant's failure to submit a medical opinion supports the conclusion that such medical opinion would not help the claimant's case. This argument misses the mark.

Plaintiff is arguing that the ALJ did not account for the objective medical evidence in 2015. In her reply, she references the TTE (Doc. 16 at 3) and says it denotes a worsening condition. In the opening brief, Plaintiff castigated the ALJ for playing doctor and reaching his own medical conclusion. (Doc. 12 at 7). Now he is castigated for failing to interpret evidence and form a favorable opinion. If the TTE showed a worsening condition that limited Plaintiff's functioning, she should have provided medical opinion evidence for the ALJ to reach that conclusion. Instead, he was left to rely on treatment notes that suggested as recent as November 2015, mere weeks before the hearing, Plaintiff

> continued to have chronic shortness of breath but denied any new cardiac complaints, including chest pain, palpitations, lightheadedness, dizziness, syncope, or presyncopal symptoms, and she was tolerating the current medical regimen well without any side effects.

(R. 18). This is the same shortness of breath Plaintiff suffered from earlier when a different cardiologist diagnosed congestive diastolic heart failure and suggested the Plaintiff engage in regular physical exercise.

In short, the Court finds the ALJ did not fail to base his RFC assessment on substantial evidence in the record.

## II.     Plaintiff's Past Work

The ALJ found the Plaintiff can perform past relevant work as a Recreation Aide as actually and generally performed. (R. 19). He found this work does not require

the performance of work-related activities precluded by the Plaintiff's residual functional capacity. (R. 19). Plaintiff testified that she cooked for large numbers of children and helped set up activities by setting up trampolines and other equipment outdoors for the occupation that the VE found most closely resembled a recreation aide. These tasks were performed as part of her employment duties for an after school program for latchkey children at Hawthorne Irving.

The Court understands Hawthorne Irving Elementary school to be located in Rock Island, IL and Plaintiff to currently reside in Peoria, IL. Common experience and knowledge informs one that there are times during the school year in Rock Island and Peoria that temperatures can reach above 80 degrees Fahrenheit outdoors. Because of this fact, the Court cannot find any justification for the ALJ to find that Plaintiff's RFC limits her to avoiding concentrated exposure to extreme heat (defined as greater than 80 degrees Fahrenheit) yet also find that Plaintiff can do a job now that requires her to carry heavy equipment outdoors in temperatures that can reach above 80 degrees Fahrenheit outdoors. The Commissioner does not address this tremendous inconsistency in the ALJ's decision in her memorandum in support of summary affirmance. For this reason alone, the ALJ committed a serious error that requires the matter to be remanded.

Plaintiff points out that this job was the only job that the VE found capable of given the ALJ's RFC finding. She contends that Plaintiff never performed the job of a recreation aide and therefore she should have been found disabled under the grid

rule, given that she was over 55 years old for the entire period in question. The Court does not agree with this argument.

In the Court's view, recreation aide was the closest occupation that fit most of the tasks Plaintiff stated she performed in her relevant work history. Thus, the Court agrees with the Commissioner that the ALJ followed the legal precedent of cases like *Strittmatter v. Schweiker*, 729 F.2d 507 (7th Cir. 1984), and determined the physical demands of the *particular type* of [jobs] that Plaintiff had done and then compared those demands to her present capabilities. *Id.* at 509. However, because the ALJ found Plaintiff could perform a past relevant job that had an actual task foreclosed by her current RFC, the only correct finding the ALJ should have reached was that Plaintiff could not perform any past relevant work.

Thus, the matter must be remanded to the ALJ to go forward and perform the fifth step of the five-step sequential evaluation process, which is consideration of the ALJ's assessment of Plaintiff's RFC and age, education, and work experience to see if Plaintiff can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

One final note on credibility. The Plaintiff claims the ALJ erred in not applying Social Security Ruling 16-3p. As far as this Court is concerned the ALJ need not revisit the credibility of the Plaintiff's statements or reconfigure her RFC. But 20 C.F.R. § 404. 983 indicates that when a matter is remanded to an ALJ, any issues relating to the Plaintiff's claim may be considered whether or not they were raised in the administrative proceedings leading to the final decision. SSR 16-3p as revised as

of October 25, 2017 clearly states that "[i]f a court finds reversible error and remands a case for further administrative proceedings after March 28, 2016, the applicable date of this ruling, we will apply this ruling to the entire period at issue in the decision we make after the court's remand." Thus, it is clearly that to the extent an ALJ revisits Plaintiff's statements, she will utilize SSR 16-3p instead of SSR 96-7p.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED the Motion for Summary Judgment (Doc. 11) filed by the Plaintiff, Lois A., is GRANTED and the Motion for Summary Affirmance (Doc. 13) filed by the Defendant, Nancy A. Berryhill, Commissioner of Social Security, is DENIED. The decision of the Commissioner of Social Security is REVERSED and the case is REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for a determination of whether Plaintiff's residual functional capacity, age, education, and work experience would allow her to make an adjustment to other work pursuant to 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v).

SO ORDERED.

CASE TERMINATED.

Entered this 9th day of August, 2018.


                                         s/ Joe B. McDade
                                         JOE BILLY McDADE
                          United States Senior District Judge